**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **U. S. COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | **Civil Action No: 14-cv-7877** |
| **v.** | |
| **FUTURES INTERNATIONAL LLC and AMEDEO CERRONE,** | **Hon._____** |
| **Defendants.** | |

## COMPLAINT

The United States Commodity Futures Trading Commission ("Commission" or "CFTC"),

by and through its attorneys, alleges as follows:

## I.    INTRODUCTION

1.    From at least 2009 to November 2012 ("the relevant period"), Kent Woods

("Woods"), a floor broker in the soybean crush market at the Chicago Board of Trade ("CBOT"),

ran a brokerage operation, Defendant Futures International LLC ("FI"), through which he

improperly exercised discretion over the accounts of commercial customers without the required

power of attorney.   Woods habitually failed to obtain or record order instructions from his

customers, and frequently executed or directed FI employees to execute orders without the

customer specifying the precise commodity interest to be purchased or sold and the exact amount

of the commodity interest to be purchased or sold.   When executing trades or causing trades to be

executed, Woods also often did not identify the accounts receiving the trades to FI employees

handling trade documentation until after trades were executed.   For their part, to make it appear

as if FI complied with applicable record-keeping requirements that order information be recorded

on order tickets immediately upon receipt of order instructions (rather than waiting until after execution), FI employees routinely used "pre-timestamped" floor order tickets to document trades. FI employees prepared these pre-timestamped floor order tickets by time-stamping blank floor order tickets throughout the trading session. Then, once Woods allocated a trade to a particular account, sometimes hours after execution, FI employees used one of these pre-timestamped tickets so that it appeared as if FI had timely prepared an order ticket upon receipt of a customer order. FI employees then submitted order tickets bearing the false timestamps for keypunching, and the false data was thereafter transmitted to the CBOT, in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.* (2012), and the Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2013).

2.      FI employees conducted FI business via instant messages, among other methods. During the relevant period, FI failed to maintain full and complete records of its employees' instant messages in violation of Regulations 1.31 and 1.35. FI's inability to produce complete records hindered the CFTC's ability to investigate violations of the Act and Regulations.

3.      Supervision failures at FI contributed to FI's unlawful floor practices and violations of the Act and Regulations. For example, until at least September 2012, FI did not have written policies or procedures governing its trading and floor operations. FI also did not provide formal training to its employees despite hiring some individuals with no industry experience. FI's Compliance Officer had no experience on the trading floor and ignored that aspect of FI's business. As a Principal and registered Associated Person ("AP") of FI, Defendant Amedeo Cerrone ("Cerrone") was a controlling person of FI and was responsible for implementing adequate procedures and diligently supervising FI's employees to ensure FI's compliance with the Act and Regulations in handling customer orders.

4.      By this conduct and further conduct described herein, Defendant FI has engaged, is engaging, or is about to engage in acts and practices that violate Sections 4g and 9(a)(4) of the Act, 7 U.S.C. §§ 6g, 13(a)(4) (2012), and Regulations 1.31, 1.35, 166.2, and 166.3, 17 C.F.R. §§ 1.31, 1.35, 166.2, 166.3 (2013).

5.      By this conduct and further conduct described herein, Defendant Cerrone has engaged, is engaging or is about to engage in acts and practices that violate Section 4g of the Act, 7 U.S.C. § 6g (2012), and Regulations 1.31, 1.35, and 166.3, 17 C.F.R. §§ 1.31, 1.35, 166.3 (2013).

6.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants FI's and Cerrone's (collectively, "Defendants") unlawful acts and practices and compel their compliance with the Act and the Regulations.  Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below. In addition, the Commission seeks restitution, disgorgement, a civil monetary penalty, pre- and post-judgment interest, and such other equitable relief as this Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2006), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

8.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that Defendants inhabit this District and have transacted and/or transact business in this District, and Defendants' acts and practices in violation of the Act and Regulations occurred, are occurring, and/or are about to occur within this District.

## III.    PARTIES

9.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2012), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2013).

10.     Defendant **Futures International LLC** is an Illinois limited liability company formed in August 2004 with a primary business address at 190 South LaSalle Street, Suite 410, Chicago, Illinois.   FI is an Introducing Broker ("IB") and CBOT member firm that trades agricultural futures and options on the floor of the CBOT and on the Globex electronic trading platform, including futures contracts in soybeans, soybean meal, soybean oil, and the soybean "crush" spread (a spread trade involving buying or selling soybean futures contracts and simultaneously selling (or buying) soybean meal and soybean oil futures contracts).   During the relevant period, FI was one of (if not the) largest participant(s) in the crush market on the floor of the CBOT.   FI has been registered with the Commission as an IB since November 2004.

11.     Defendant **Amedeo Cerrone** resides in St. Charles, Illinois.   Cerrone co-founded FI in approximately 2004 with Woods and Principal A.   In approximately 2009, a Houston-based company purchased a 60% interest in FI, but Cerrone has maintained in excess of 10% ownership of the company at all times relevant.   Cerrone has served as FI's Chief Operating Officer since its inception.   In this role, Cerrone has been responsible for interviewing, hiring,

and supervising FI employees, among other general and operational duties. Cerrone has been registered with the Commission as an AP of FI and has been an FI Principal since November 2004. Cerrone has also been registered as a Floor Broker since February 2003.

## IV.    RELEVANT NON-PARTY

12.    Woods is the former Chief Executive Officer of FI, and resides in Chicago, Illinois. He founded FI with Cerrone and Principal A in approximately 2004 and left the company in February 2013. Woods has maintained in excess of 10% ownership of the company at all times relevant. During his tenure at FI, Woods ran the soybean "crush" group, including by overseeing the day-to-day operations and supervising employees in that group. Woods was registered with the Commission as an AP of FI from November 2004 until February 2013, when he left the company and withdrew his registration, and has been an FI Principal since November 2004. He has also been registered as an AP of a Commodity Trading Advisor ("CTA") since March 2011, and has been a Principal of that CTA since February 2011. Woods was registered with the Commission as a Floor Broker from October 1990 to September 2013, when he withdrew his registration, and at all relevant times was a member of the CBOT.

13.    On October 8, 2014, the CFTC entered an order instituting proceedings against Woods pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions. The Order finds that Woods violated Sections 4g and 9(a)(4) of the Act, 7 U.S.C. §§ 6g, 13(a)(4) (2012), and Regulations 1.31, 1.35, 166.2, and 166.3, 17 C.F.R. §§ 1.31, 1.35, 166.2, 166.3 (2013), based on the same conduct described herein. Among other things, the Order requires that Woods: (i) cease and desist from further violations of Sections 4g and 9(a)(4) of the Act, 7 U.S.C. §§ 6g, 13(a)(4) (2012), and Regulations 1.31, 1.35, 166.2, and 166.3, 17 C.F.R. §§ 1.31, 1.35, 166.2, 166.3 (2013); (ii) pay a civil monetary

penalty in the amount of $200,000, plus post-judgment interest; and (iii) execute non-electronic orders only through his employer's floor desk for a period of two years.

## V.     FACTS

### A.     Definitions and Terminology

14.     The futures markets are price discovery markets that provide a centralized marketplace where traders can shift risk.   Price discovery occurs through the open and competitive execution of trades on the centralized market.   To protect the integrity of the market process, the Act, Regulations and CBOT Rules generally require trades to be executed openly and competitively and prohibit trading practices that undermine the price discovery process, such as non-competitive trades.

15.     A "futures contract" is an agreement to purchase or sell a commodity for delivery in the future, at a price determined at the initiation of the contract, which obligates each party to fulfill the contract at the specified price, is used to assume or shift price risk, and may be satisfied by delivery or offset.   The terms of exchange-traded futures contracts are standardized as to size, pricing increments and expirations.

### B.     The Marketplace and Soybean Futures

16.     The CBOT is a designated contract market ("DCM") pursuant to Sections 5 and 6(a) of the Act, 7 U.S.C. §§ 7 and 8(a) (2006), and Part 38 of the Regulations, 17 C.F.R. §§ 38.1 *et seq*. (2013), headquartered in Chicago, Illinois, that provides a marketplace for trading  futures contracts in soybeans, soybean meal, soybean oil, and the soybean "crush" spread.

17.     Traders may buy and sell soybeans, soybean meal, soybean oil, and the soybean "crush" spread during stated trading hours either in open outcry trading sessions in a physical

trading pit located on the trading floor at the CBOT or on Globex, the CBOT's electronic trading platform, which traders may access worldwide through a range of connectivity options.

18.     During the relevant time, the market for trading soybeans, soybean meal, soybean oil, and the soybean "crush" spread took place on the trading floor pit from 8:30 a.m. to 1:15 p.m. CST Monday through Friday, and on Globex from 7:00 p.m. to 7:45 a.m. CST Sunday evening through Friday morning and also 8:30 a.m. to 1:15 p.m. CST Monday through Friday.

19.     A soybean futures contract consists of 5,000 bushels of soybeans.  The CBOT lists soybean futures contracts for seven months in the March quarterly cycle (January, March, May, July, August, September and November).  The contract trades in minimum price increments (or "ticks") of one quarter of one cent per bushel, equivalent to $12.50 per futures contract per tick.

20.     A soybean meal futures contract consists of 100 short tons of soybean meal.  The CBOT lists soybean meal futures contracts for eight months in the March quarterly cycle (January, March, May, July, August, September, October and December).  The contract trades in ticks of ten cents per short ton, equivalent to $10.00 per futures contract per tick.

21.     A soybean oil futures contract consists of 60,000 pounds of soybean oil.  The CBOT lists soybean oil futures contracts for eight months in the March quarterly cycle (January, March, May, July, August, September, October and December).  The contract trades in ticks of $.0001 per pound, equivalent to six dollars per futures contract per tick.

22.     Soybean "crushing" is the physical process of converting soybeans into soybean meal and soybean oil.  A standard soybean crush futures spread contract consists of 50,000 bushels or ten futures contracts of soybeans, 243 metric tons or nine futures contracts of soybean meal and approximately 1000 metric tons or eleven futures contracts of soybean oil.  The spread

is commonly used by soybean processors to help manage the price risk associated with buying soybeans and selling soybean meal and oil. The CBOT lists the soybean crush futures spread contract for eight months in the March quarterly cycle (January, March, May, July, August, September, October and December). The contract trades in ticks of one quarter of one cent per bushel, equivalent to $125.00 per futures contract per tick.

### C. False Records

23. Section 4g(a) of the Act, 7 U.S.C. § 6g(a) (2012), provides that every person registered as a futures commission merchant, IB, floor broker, or floor trader shall keep books and records pertaining to transactions and positions of their customers and commodities for future delivery, and shall make such records available to inspection by the Commission. In relevant part, as implemented pursuant to this authority, Regulation 1.31(a), 17 C.F.R. § 1.31(a) (2013), requires that all books and records required to be kept by the Act or by the Regulations shall be kept for a period of five years from the date thereof and be subject to inspection by any representative of the Commission; Regulation 1.35(a), 17 C.F.R. § 1.31(a) (2013), requires that IBs and members of contract markets must retain and produce for inspection all original source documents on which trade information is originally recorded, whether or not such documents must be prepared pursuant to the rules or Regulations of either the Commission or the contract market.

24. IBs such as FI are subject to Commission and CBOT rules and regulations governing trading practices in the CBOT soybean complex. For example, under Regulation 1.35(a-1), IBs are required to record customer orders "immediately" upon receipt of the order. The required written record must include the customer's account number and the date and time the order was received, to the nearest minute.

25.     Time brackets are letters or symbols that correspond to specific fifteen-minute time increments within the trading session.  Time brackets serve as part of an audit trail for the exchange and the members.  Floor brokers and floor traders are required to record the time bracket letter or symbol on an executed order ticket.  This bracketing system helps to pinpoint within a fifteen-minute range the time that a trade took place.

26.     FI employees took orders from customers and internally communicated order instructions via telephone, headset, email and through instant messenger.

27.     From at least 2009, FI employees failed to properly record customer orders immediately upon receipt.  For example, Woods received a number of customer orders over the telephone from his office, prior to the opening of the CBOT trading floor.  Woods frequently did not complete an office order ticket documenting the order instructions and the time at which he received an order in those instances.  Instead, FI employees would prepare and timestamp floor order tickets at some later time, such that the timestamp on the order tickets would not reflect the actual time at which the order was actually received.

28.     Even when Woods received orders during trading hours, he and FI employees regularly failed to prepare a complete record of the order upon receipt.  Instead, during the relevant period, it was a common practice at FI to record the order only once the order was executed, or "filled," and to place the order and fill information on the floor order ticket at the same time.

29.     FI employees sought to ensure that timestamps on FI floor order tickets recording the receipt time of the order did not conflict with other timing information collected and maintained by the CBOT for the order, such as pit execution time and order-out times.  To do so, FI employees prepared pre-timestamped floor order tickets on a daily basis by time-stamping

blank order tickets in time brackets throughout the trading session. FI employees then could select a pre-timestamped order ticket from this inventory reflecting a time that appeared consistent with the order's actual execution time, regardless of when the order was actually received and/or written-up.

30.     During the relevant period, FI routinely used pre-timestamped floor orders to document trades after their execution, as described above.

31.     FI employees submitted the pre-timestamped and belatedly prepared order tickets to FI's clearing firm for keypunching, and the false data was thereafter transmitted to the CBOT.

**D.     Unauthorized Trading**

32.     FI did not obtain a power of attorney to trade any of its customer accounts and thus FI did not have discretion to place trades for commercial customers without their consent and instruction as to the specific contract the customer wanted to trade, the quantity the customer wanted to trade, and the price at which the customer wanted to trade.

33.     Nonetheless, Woods often made trading decisions on behalf of his and FI's commercial customers without their specific consent and instruction as required under the Regulations. For example, Woods executed (or directed execution of) trades based on order instructions that did not specify the contract month that the customer wanted to trade and/or the amount of the commodity interest to be purchased.

34.     In at least twenty instances, Woods (or FI employees) placed a trade without knowing what account would eventually receive it, and then Woods "shopped" the trade to potentially interested customers. In the interim, Woods instructed FI employees to "hold" the trade (thus refrain from allocating it to an account and preparing an order ticket) while he determined what to do with it.

35.     On at least four occasions, Woods could not find a customer to accept an executed trade, and directed FI employees to assign the trade to an account designated for error trades (an "error account") and/or his personal account.

36.     For example, on November 10, 2011, Broker A executed a trade at 10:12 a.m. at Woods' request and reported the fill.  Woods then directed a clerk to "hold" the trade while he talked to Customer B.  When Customer B did not want the trade, FI closed the position by executing an offsetting trade nearly three hours after placing the initial trade.  FI employees thereafter placed both the initial and offsetting trades, which generated a profit of $2,390, into Woods' personal account.  FI employees used a pre-timestamped order ticket to document that trade such that the order ticket reflected that Woods placed the order for his personal account at 9:26 a.m., when in fact he decided to give the trade to himself several hours later.

37.     In another similar example on November 15, 2011, FI employees used pre-timestamped order tickets to make it appear that FI received and prepared two crush orders for Woods' personal account at 9:26 a.m.  In fact, as of approximately 9:38 a.m., Woods was unsure who would receive the trades.  As a result, Woods initially instructed Broker A to hold the trades while he tried to "figure it out."  At 9:55 a.m., Woods instructed a clerk to put both orders into his personal account.  Later that day, Woods (or FI employees) offset the positions Woods had given to himself at a gain of $3,088.50 to his personal account.

38.     The use of pre-timestamped floor orders enabled Woods and FI employees to allocate trades subsequent to their execution and disguise the unauthorized trading practices.

### E.     Missing Records

39.     Among other things, Regulations 1.31 and 1.35 require IBs to maintain full and complete records relating to transactions involving commodity futures and options for a period of five years.

40.     FI employees used personal devices to communicate electronically via instant messages regarding FI business, including but not limited to transactions involving commodity futures and options, as of at least late 2009 and continuing throughout the relevant period.

41.     During the relevant period, FI had no policies or procedures relating to the use of or access to employees' electronic communications.

42.     Instead, in approximately 2010, FI employees were instructed to email copies of their instant message conversations relating to FI business to an email address that was reviewed by Cerrone.  FI employees were first instructed to email copies of conversations as they occurred, and then at the end of the day for anything that "would constitute recordkeeping."

43.     FI assumed that the internet service provider(s) would maintain readily accessible copies of its employees' instant messages relating to FI business.  FI did not verify whether that would in fact occur.

44.     FI did not otherwise capture, maintain or store FI employees instant messages for the relevant period relating to FI business until at least 2012.

45.     FI could not produce full and complete records of its employees' instant messages when requested to do so by the CFTC.

46.     FI's failure to produce a complete audit trail hindered the Commission's ability to fully investigate violations of the Act and Regulations.

### F.     Lack of Supervision

47.     Prior to at least September 2012, FI had no written policies or procedures governing its trading or floor operations, including order intake, preparation of order tickets, handling error trades, trade execution, priority of customer orders and recordkeeping.

48.     Prior to at least September 2012, FI's policies and procedures regarding order intake, preparation of order tickets, handling error trades, trade execution, priority of customer orders and recordkeeping, if any existed, were not explained to FI employees under Woods' and Cerrone's supervision.

49.     FI had a Compliance Officer from 2004 and continuing throughout the relevant period, but the Compliance Officer did not have experience with floor operations, he never visited the trading floor to observe or supervise FI's practices, he never reviewed FI's policies or practices with respect to floor operations, and he did not oversee activities related to the trading desk or floor.

50.     FI hired a compliance consultant in late 2011 or early 2012 to assist FI in complying with CFTC rules and regulations, improving FI's order procedures, conducting AML testing and creating a disaster recovery plan, among other things. However, according to Cerrone, the compliance consultant did not identify any issues with FI's compliance procedures or provide any compliance training to FI employees during the relevant period.

51.     Cerrone identified a senior clerk (under his supervision) as responsible for ensuring compliance with CFTC rules and regulations with respect to the order ticketing process and trading desk activities during the relevant period. However, that employee was not told that she had such responsibilities and in fact, she was principally involved in FI's practice of pre-timestamping floor order tickets in the various time brackets during each trading day.

52.     Prior to at least September 2012, no one at FI provided adequate training to FI employees regarding compliance with CFTC and CBOT rules and regulations despite the fact that FI had hired some employees with no industry or trading experience.

53.     Cerrone did not act diligently to oversee the activities of FI employees under his supervision, nor did he act to ensure that employees under his supervision complied with the Act and Regulations.

54.     As a result, FI and Cerrone violated the Act, Regulations, and CBOT rules, including but not limited to the violations described in this Complaint.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISION REGULATIONS

### Count I

### Violation of Section 9(a)(4) of the Act: Submission of False Documents to a Board of Trade

55.     Paragraphs 1 through 54 are re-alleged and incorporated herein by reference.

56.     Section 9(a)(4), 7 U.S.C. § 13(a)(4) (2012) prohibits:

> Any person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, or futures association designed or registered under this Act acting in furtherance of its official duties under this Act.

57.     FI, through employees acting on its behalf, violated Section 9(a)(4), 7 U.S.C. § 13(a)(4) (2012), by willfully submitting order tickets with false time-stamp information for keypunching.  FI employees knew that the fictitious information reflected on its order tickets would thereafter be transmitted to CBOT.

58.     The acts, omissions, and failures of FI employees that prepared the order tickets with false time-stamp information and submitted them for keypunching did so within the scope

of their employment, office or agency with FI. Therefore, FI is liable for its employees' acts, omissions, and failures constituting violations of Section 9(a)(4), 7 U.S.C. § 13(a)(4) (2012), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

59.     Each false entry to CBOT, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 9(a)(4), 7 U.S.C. § 13(a)(4) (2012).

## Count II

### Violation of Section 4g of the Act and Commission Regulations 1.31 and 1.35(a): Failure to Maintain Required Books and Records

60.     Paragraphs 1 through 54 are re-alleged and incorporated herein by reference.

61.     Section 4g(a) of the Act, 7 U.S.C. § 6g(a) (2012), provides that every person registered as a futures commission merchant, IB, floor broker, or floor trader shall keep books and records pertaining to transactions and positions of their customers and commodities for future delivery, and shall make such records available for inspection by the Commission.

62.     Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2013), generally requires IBs to:

> keep full, complete, and systematic records, together with all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity futures … in accordance with the requirements of § 1.31 … Included among such records shall be all orders (filled, unfilled, or canceled), trading cards, signature cards, street books, journals, ledgers, canceled checks, copies of confirmations, copies of statements of purchase and sale, and all other records, data and memoranda, which have been prepared in the course of its business of dealing in commodity futures …

63.     Regulation 1.31, 17 C.F.R. § 1.31 (2013), provides that "all books and records required to be kept by the Act or by these regulations shall be kept for a period of five years from the date thereof and shall be readily accessible during the first 2 years of the 5-year period."

64.     FI violated Section 4g of the Act and Regulations 1.31 and 1.35(a) by failing to maintain for the requisite period full, complete, and systematic records of all transactions relating to its business of dealing in commodity futures, including but not limited to its instant messages.

65.     Cerrone controlled FI and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting FI's violations alleged in this count.  Cerrone is therefore liable for FI's violations of Section 4g of the Act, 7 U.S.C. § 6g (2012), and Regulations 1.31 and 1.35(a), 17 C.F.R. §§ 1.31, 1.35(a) (2013) as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

66.     The foregoing acts, omissions, and failures of Cerrone and/or other FI employees occurred within the scope of their employment, office or agency with FI.  Therefore, FI is liable for the acts, omissions, and failures constituting violations of Section 4g of the Act, 7 U.S.C. § 6g (2012), and Regulations 1.31 and 1.35(a), 17 C.F.R. §§ 1.31, 1.35(a) (2013), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

67.     Each missing record, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Regulations 1.31 and 1.35(a), 17 C.F.R. §§ 1.31, 1.35(a) (2013).

### Count III

**Violation of Section 4g of the Act and Commission Regulation 1.35(a-1):**
**Failure to Maintain Adequate Records of Futures Transactions**

68.     Paragraphs 1 through 54 are re-alleged and incorporated herein by reference.

69.     As set forth above, Section 4g(a) of the Act, 7 U.S.C. § 6g(a) (2012), provides that every person registered as a futures commission merchant, IB, floor broker, or floor trader shall keep books and records pertaining to transactions and positions of their customers and

commodities for future delivery, and shall make such records available for inspection by the Commission. Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2013), requires IBs to "keep full, complete, and systematic records, together with all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity futures…"

70. Regulation 1.35(a-1)(1), 17 C.F.R. § 1.35(a-1)(1) (2013), specifically requires that each IB receiving a customer order:

> shall immediately upon receipt thereof prepare a written record of the order including the account identification [except in certain circumstances related to bunched orders], and order number, and shall record thereon, by timestamp or other timing device, the date and time, to the nearest minute, the order is received . . . .

71. Regulation 1.35(a-1)(2)(i) further requires that any member who receives a non-written customer order on the floor must:

> immediately upon receipt thereof prepare a written record of the order in nonerasable ink, including the account identification [except in certain circumstances related to bunched orders] and order number and shall record thereon, by timestamp or other timing device, the date and time, to the nearest minute, the order is received.

72. FI employees failed to prepare written records of orders upon receipt in compliance with the requirements set forth in Regulation 1.35. Instead, FI documented orders later in the trading day, at times after execution, and often using pre-timestamped floor order tickets.

73. The foregoing acts, omissions, and failures of FI employees and principals occurred within the scope of their employment, office or agency with FI. Therefore, FI is liable for the acts, omissions, and failures constituting violations of Section 4g of the Act, 7 U.S.C. § 6g (2012), and Regulation 1.35(a-1), 17 C.F.R. § 1.35(a-1) (2013), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

74.     Each order that was not properly documented, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4g of the Act, 7 U.S.C. § 6g (2012), and Regulation 1.35(a-1), 17 C.F.R. § 1.35(a-1) (2013).

**Count IV**

**Violation of Commission Regulation 166.2:**
**Unauthorized Trading**

75.     Paragraphs 1 through 54 are re-alleged and incorporated herein by reference.

76.     Regulation 166.2, 17 C.F.R. § 166.2 (2013), prohibits any IB or any of their APs, directly or indirectly, to effect a transaction on behalf of a customer without first obtaining from the customer or the person designated to control the account: (1) "[t]he precise commodity interest to be purchased or sold; and (2) [t]he exact amount of the commodity interest to be purchased or sold[.]"

77.     FI violated Regulation 166.2 in that Woods placed orders for customers without a power of attorney and without obtaining specific information from FI customers about the quantity and/or the precise commodity interest to be purchased or sold.

78.     The foregoing acts, omissions, and failures of Woods occurred within the scope of his employment, office or agency with FI.  Therefore, FI is liable for Woods' acts, omissions, and failures constituting violations of Regulation 166.2, 17 C.F.R. § 166.2 (2013), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

79.     Each unauthorized trade, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Regulation 166.2, 17 C.F.R. § 166.2 (2013).

**Count V**

**Violation of Commission Regulation 166.3:**
**Failure to Supervise**

80.     Regulation 166.3, 17 C.F.R. § 166.3 (2013) requires:

> Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or other persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees, and agents (or other persons occupying a similar status or performing a similar function) relating to its business as a registrant.

81.     FI and Cerrone were both registered with the Commission during the relevant period.

82.     During the relevant period, Cerrone had supervisory duties at FI.

83.     FI and Cerrone violated Regulation 166.3, 17 C.F.R. § 166.3 (2013), in that they, among other things: (i) failed to establish written policies and procedures governing trading floor operations until at least September 2012; (ii) did not provide formal training to FI employees despite hiring some individuals with no industry experience; and (iii) did not implement adequate procedures and/or diligently supervise FI employees to ensure compliance with the Act and Regulations.

84.     Cerrone controlled FI and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting FI's violations alleged in this count. Cerrone is therefore liable for FI's violations of Regulation 166.3, 17 C.F.R. § 166.3 (2013) as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

85.     The foregoing acts, omissions, and failures of Woods, Cerrone and other FI employees and principals occurred within the scope of their employment, office or agency with FI. Therefore, FI is liable for the acts, omissions, and failures constituting violations of

Regulation 166.3, 17 C.F.R. § 166.3 (2013), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

86.     Each failure to supervise, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Regulation 166.3, 17 C.F.R. § 166.3 (2013).

## VII.   RELIEF REQUESTED

WHEREFORE, for the reasons stated above, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.      Enter an order finding that Defendant FI violated Sections 4g and 9(a)(4) of the Act, 7 U.S.C. §§ 6g, 13(a)(4) (2012), and Regulations 1.31, 1.35, 166.2, and 166.3, 17 C.F.R. §§ 1.31, 1.35, 166.2, 166.3 (2013);

B.      Enter an order finding that Defendant Cerrone violated Section 4g of the Act, 7 U.S.C. § 6g (2012), and Regulations 1.31, 1.35, and 166.3, 17 C.F.R. §§ 1.31, 1.35, 166.3 (2013);

C.      Enter an order of permanent injunction prohibiting Defendants and all persons insofar as they are acting in the capacity of Defendants' agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendants, who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.      Engaging in conduct in violation of Sections 4g and 9(a)(4) of the Act, 7 U.S.C. §§ 6g, 13(a)(4) (2012), and Regulations 1.31, 1.35, 166.2, and 166.3, 17 C.F.R. §§ 1.31, 1.35, 166.2, 166.3 (2013);

2.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a (2012);

3.     Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2013)) ("commodity options"), security futures products, swaps (as that term is defined in Section 1a(47) of the Act, 7 U.S.C. §1a(47) (2012), and further defined by Regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx) (2013)), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B), 2(c)(2)(C)(i)) (2012) ("forex contracts")), for any personal or proprietary account or for any account in which it has a direct or indirect interest;

4.     Having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on their behalf;

5.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

6.     Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

7.     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013); and/or

8.     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2013)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a (2012)) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013).

D.     Enter an order assessing a civil monetary penalty against each Defendant in the amount of the higher of $140,000 for each violation of the Act or Regulations committed or triple the monetary gain to Defendants for each violation of the Act and/or Regulations described herein occurring on or after October 23, 2008, plus post-judgment interest;

E.     An order requiring Defendants make full restitution, pursuant to such procedure as the Court may order, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

F.     An order requiring Defendants to disgorge to any officer appointed by the Court or directed to the Court all benefits received from acts or practices that constitute violations of the Act and the Regulations, including pre and post-judgment interest;

G.     Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

H.     Order such other and further remedial ancillary relief as the Court may deem appropriate.

Respectfully submitted,

Date: October 9, 2014

s/ Allison V. Passman
Allison V. Passman, ARDC # 6287610
(apassman@cftc.gov)
Susan Gradman, ARDC # 6225060
(sgradman@cftc.gov)
Rosemary Hollinger, ARDC # 3123647
(rhollinger@cftc.gov)
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0700